UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                         :

CLIFFORD TEACHOUT,                      :
                                                         :

                         Plaintiff,     :
                                                         :                 04 Civ. 945 (GEL)

     -against-                 :
                                                         :          **OPINION AND ORDER**

THE NEW YORK CITY DEPARTMENT  :
OF EDUCATION,                   :
                                                         :

                         Defendant.  :
                                                         :
-------------------------------------------------------x

Kira Repetto-Cruz, Spar & Bernstein, P.C.,
New York, New York, for Plaintiff.

Michael A. Cardozo, Corporation Counsel
of the City of New York (by A. Ali Ayazi,
Assistant Corporation Counsel), New York,
New York, for Defendants.


GERARD E. LYNCH, District Judge:

      Plaintiff Clifford Teachout brings this discrimination action against the New York City

Department of Education ("DOE") in connection with his employment at Forest Hills High

School. Teachout claims that the DOE discriminated against him because of his disabilities,

failed to provide him with reasonable accommodations, and retaliated against him for protected

activity, all in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et*

*seq*. ("ADA") and various sections of the New York City Administrative Code. Defendant DOE

now moves for summary judgment, arguing, *inter alia*, that Teachout is not disabled within the

meaning of the ADA, that DOE provided Teachout with reasonable accommodations, that

Teachout cannot show any connection between either discrimination or retaliation and his

termination, and that Teachout's city administrative claims are barred by collateral estoppel. For the reasons below, DOE's motion will be granted in part, and denied in part.

## BACKGROUND

Clifford Teachout is a special education teacher; he is also HIV-positive, diabetic, and dyslexic. (Teachout Aff. ¶¶ 5, 6, 9.) On October 11, 2000, Teachout began working for DOE as a probationary special education teacher at the Raul Julia School in the Bronx. (Def. Rule 56.1 Stmt. ¶¶ 7, 10.) While at the Raul Julia School, Teachout requested a transfer to a school closer to his home for medical reasons, and that request was granted on October 28, 2002, when Teachout was transferred to Forest Hills High School. (Id. ¶ 26.) Upon arriving at Forest Hills, Teachout was introduced to Barbara Cali, the Assistant Principal of Special Education. (Id. ¶ 31.) Cali created a teaching schedule for Teachout for the fall semester, in which he co-taught three classes with more experienced teachers and taught two periods of history by himself. (Id. 33.) In the spring semester of 2003, Teachout taught four periods of global history, again by himself, and one period of English, which he co-taught with another faculty member. (Id. 39.)

Approximately one month into the spring semester, on March 4, 2003, Teachout sent an email to the Office of Equal Opportunity ("OEO") claiming that Forest Hills had received a copy of his personnel file, which indicated he was HIV-positive and diabetic, and that after receiving his file Cali began discriminating against him and criticizing his teaching methods. (Id. ¶ 44, Ayazi Decl. Ex. II.) This email complaint followed a period of less than amicable relations between Teachout and Cali. On January 21, 2003, Cali observed a class taught by Teachout and gave him an unsatisfactory review (Def. Rule 56.1 Stmt. ¶ 37); on February 14, 2003, Teachout

called Cali a "bitch" in the presence of a student and a faculty member[1] (id. ¶ 41); on February 28, 2003, Teachout was again observed by Cali and again received an unsatisfactory rating (id. ¶ 42); on March 3, the day before sending the email to OEO, Teachout met with Cali and other administrators to discusses his evaluations, and was directed to meet with Cali and the chair of the social studies department every Monday to review lesson plans for the upcoming week (Ayazi Decl. Ex. DD).

On March 13, 2003, the week after sending his email to OEO, Teachout wrote to tell Cali that the Monday meetings she had scheduled interfered with his lunch period, and that due to his diabetes he needed to eat his lunch at a regular hour. (Def. Rule 56.1 Stmt. ¶ 47.) The next day, Cali agreed to move the meetings to a different period. (Id. ¶ 48.) This moment of detente, however, was not a sign of smoother sailing ahead. On March 27, 2003, Cali and Forest Hills Principal Stephen Frey observed Teachout's class and once again Teachout received an unsatisfactory rating. Following this observation, on April 7, 2003, Frey submitted a form to the

_____

[1] This fact provides an illustrative example of Teachout's unhelpful response to DOE's Rule 56.1 statement. DOE asserts in paragraph 41 of its Rule 56.1 statement that "On February 14, 2003, plaintiff entered an office on the second floor of Forest Hills High School and loudly stated, 'Barbara Cali is such a bitch.' Plaintiff made this comment in front of Ms. Deanna Tsiakos, another teacher and a student." Teachout responds only by stating "Disputed," and citing to the exact same document relied upon by DOE in support of its claim, a statement by Tsiakos (Ayazi Decl. Ex. FF). Upon close review of Tsiakos's statement, it appears that while there is some ambiguity in the language, there was not "another teacher" in the room when Teachout made this statement. This is apparently the basis for Teachout's "dispute," since later Teachout admits to making the statement (Pl. Rule 56.1 Stmt. ¶ 52). The Court, however, is left to speculate. Teachout's briefing contains other examples of this sort of tactic, and the net effect often leaves the Court unclear as to what exactly Teachout is opposing or asserting in response to DOE's motion.

district superintendent, indicating that Teachout was at risk for termination.[2]  (Id. ¶ 51, Ayazi Decl. Ex. OO.)  On April 9, Teachout sent another email to OEO, again complaining about his treatment at the hands of Cali, including claims that she verbally assaulted him in the hallway, that she called him "stupid" and a "fucking faggot," that he does not have an assigned lunch time, and that his classes were not near a bathroom despite previous requests.  (Def. Rule 56.1 Stmt. ¶ 53, Ayazi Decl. Ex. PP.)  In response to this email, OEO informed Cali and Frey that Teachout had made allegations of discrimination against them.[3]  (Def. Rule 56.1 Stmt. ¶¶ 54, 56, Ayazi Decl. Ex. DD & Ex. QQ.)

On May 1, 2003, Teachout filed a complaint with the New York State Division of Human Rights ("DHR") against DOE, alleging that he was being discriminated against because of his HIV-positive status, his diabetes, and his dyslexia, as evidenced by the verbal abuse he received from Cali and Frey and the fact that he was docked one month's pay for taking a week of sick time in November.  (Def. Rule 56.1 Stmt. ¶ 57, Ayazi Decl. Ex. RR.)  One week later, on May 7, Teachout received word from OEO that his email complaints of March 4 and April 9 were

---

[2] Teachout disputes this claim in his Rule 56.1 Statement.  (See Pl. Rule 56.1 Stmt. ¶ 51.)  However, Teachout cites to no contradictory evidence in the record, and merely asserts that *he* did not learn that he was denied continued probationary status until the fall of 2003.  However, that assertion, even if true, does not contradict DOE's claim that Frey put the wheels in motion for Teachout's eventual termination with this April 2003 submission.  See Local R. 56.1(c), (d) (stating that material facts asserted by moving party and not controverted with other evidence by non-moving party are deemed admitted).

[3] Teachout "disputes" DOE's claim that OEO informed Cali of Teachout's allegations on April 9, 2003, after OEO received Teachout's email.  (Pl. Rule 56.1 Stmt. ¶ 54.)  Teachout provides no citation, however, other than the one provided by DOE, to dispute this claim.  DOE, on the other hand, has provided Cali's notes for April 9, 2003, indicating that she received a call from OEO informing her of Teachout's claims (Ayazi Decl. Ex. DD), and a copy of OEO's email to Frey, dated April 10, 2003, in which the OEO representative states that he spoke with Cali "yesterday" and told her about Teachout's claims (id. Ex. QQ).

dismissed for insufficient evidence. (Def. Rule 56.1 Stmt. ¶ 58.) Teachout was then observed

and evaluated on two more occasions during the spring 2003 semester, and he received

unsatisfactory ratings both times.[4] After the last of these evaluations, on June 26, 2003,

Teachout was issued an unsatisfactory evaluation for the 2002-2003 school year as a whole.[5]

(Id. ¶ 65.)

     Teachout's DHR complaint was resolved on August 8, 2003, when the DHR determined

that there was no probable cause to believe Teachout's allegations of discrimination. (Id. ¶ 67.)

Two months later, on October 10, 2003, Teachout was terminated because of his unsatisfactory

2002-2003 rating and his "incompetence as a teacher." (Id. ¶ 7; Ayazi Decl. Ex. BBB). This

action followed on February 4, 2004. (Compl. 9.)

## DISCUSSION

     Teachout alleges that he is disabled due to his HIV-positive status, his diabetes, and his

dyslexia (Compl. ¶ 10-12), and that DOE's discrimination against him on these grounds, along

with DOE's retaliation against him for complaining about that discrimination, resulted in his

---

[4] Teachout disputes the first evaluation by claiming, without explanation, that the exhibit
provided by DOE as evidence of the evaluation does not contain Teachout's signature. (Pl. Rule
56.1 Stmt. ¶ 61.) Teachout is correct that his signature is not on the document. (Ayazi Decl. Ex.
VV.) However, Teachout does not explain the significance of its absence. Whether or not
Teachout signed the document says nothing about whether the document is itself an accurate
reflection of the observer's evaluation and comments. The line for Teachout's signature reads "I
have received a copy of this letter and understand that a copy will be placed in my file." (Id.)
Therefore, the Court construes Teachout's assertion that he did not sign the document as a claim
that he did not see the document before this litigation and that the document was not, or at least
should not have been, placed in his file. In any event, Teachout does not argue that the absence
of his signature on any document is material to this motion for summary judgment.

[5] Teachout disputes this assertion, based on the fact that he did not receive page one of
the two-page evaluation form. (Pl. Rule 56.1 Stmt. ¶ 65.) Once again, Teachout does not deny
the substance of the form, nor does he provide any contradictory evidence. See Local R. 56.1.

eventual termination (id. ¶¶ 25, 27, 35). Teachout also claims that his disabilities necessitated four accommodations – a classroom close to a restroom due to his "diabetic incontinence" (id. ¶ 19), a regularly scheduled lunch hour to regulate his blood sugar (id. ¶ 24), time off for doctor visits to treat his HIV infection, and an overhead projector to review his spelling before class (Pl. Mem. Opp. Summ. J. 16, 24-26) – and that these accommodation requests were denied by DOE (id. ¶¶ 19, 24). DOE has moved for summary judgment on all of these claims.

Summary judgment shall be granted if the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion." Cifarelli v. Babylon, 93 F.3d 47, 51 (2d Cir. 1996). In addition, the Court is not to make any credibility assessments or weigh the evidence at this stage. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996). To determine which facts are material, the Court must look to the substantive law that supplies the basis for the claims at issue. See Liberty Lobby, 477 U.S. at 248.

I. Is Teachout "Disabled"?

With respect to a claim of disability discrimination, the substantive law requires a plaintiff to make a prima facie showing that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential

functions of his job, with our without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability." Cameron v. Community Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003). DOE does not contest that it is an employer subject to the ADA. Therefore, the first contested issue is whether Teachout is "disabled" within the meaning of the ADA. Teachout advances four theories under which he claims to be disabled: he is dyslexic, he is diabetic, he is HIV-positive, and he was regarded as disabled by DOE.

The ADA does not contain a list of qualifying disabilities. Rather, it defines "disability" with reference to the particular individual at issue as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). DOE concedes that Teachout's claimed disabilities are the result of "impairments" within the meaning of the ADA (Def. Mem. Supp. Summ. J. 10-14), and Teachout does not claim that he has a "record of" impairment under section B, so those aspects of the statutory definition are not at issue.

The parties' principal disagreement centers on whether Teachout has produced sufficient evidence for a finder of fact to conclude that his impairments substantially limit one of his major life activities. This inquiry has two prongs: whether the activity at issue is a "major life activity," and whether the activity is "substantially limit[ed]" by the impairment.

With respect to the first prong, the term "major life activity" is given its "ordinary and natural meaning." Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 151 (2d Cir. 1998). Our Court of Appeals, while noting that agency regulations are not binding, has relied on "regulations promulgated by the EEOC under the ADA" to assist in defining and applying the

term "major life activities." Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998).

Examples of "major life activities" provided by the regulations are "functions such as caring for

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working." 29 C.F.R. § 1630.2(i), quoted in Ryan, 135 F.3d at 870. This list is illustrative, not

exhaustive. Ryan, 135 F.3d at 870.

Whether or not an activity is a major life activity does not depend on the circumstances

of a particular plaintiff; a given activity is or is not a major life activity as a matter of law.

Reeves, 140 F.3d at 152. As our Court of Appeals has explained, "We do not think that such

major life activities as seeing, hearing, or walking are major life activities only to the extent that

they are shown to matter to a particular ADA plaintiff. Rather, they are treated . . . by our

precedents as major life activities *per se*." Id.

The second prong of the inquiry, whether or not there is a substantial limitation, does

require an "individualized and fact-specific" examination. Colwell v. Suffolk County Police

Dep't, 158 F.3d 635, 643 (2d Cir. 1998). EEOC regulations relied upon by the Court of Appeals

define "substantially limits" as:

> (i) Unable to perform a major life activity that the average person
> in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration
> under which an individual can perform a particular major life
> activity as compared to the condition, manner, or duration under
> which the average person in the general population can perform
> that same major life activity.

29 C.F.R. § 1630.2(j)(1), quoted in Ryan, 135 F.3d at 870. The statutory distinction between

"impairments" and "disabilities" illustrates that "the ADA clearly does not consider every

impaired person to be disabled." Id. Therefore, it is necessary to distinguish between

impairments that "merely *affect* major life activities from those that *substantially limit* those activities." Id. The plaintiff carries the burden of making this distinction. Colwell, 158 F.3d at 644.

When determining how a particular impairment affects a particular individual, this Court, in undertaking its fact-specific examination, must consider any corrective or mitigating measures taken by that individual with respect to his impairment. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-84 (1999). For example, an individual who has an impairment, but who is able to virtually eliminate the effects of that impairment through medication, is not considered "disabled" under the ADA because his impairment does not substantially limit any of his life activities, thanks to the medication. Id. at 483. This approach is a necessary consequence of the ADA's case-by-case inquiry, because individuals are not considered disabled simply by virtue of being diagnosed with some disease or condition; rather, what is relevant is the extent to which that diagnosis affects their life. Id. at 482-84 (stating that not considering corrective measures "would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals").

A. Teachout's Dyslexia Is Not a Disability

In support of his claim that his dyslexia qualifies as a disability under the ADA, Teachout offers a definition of dyslexia, states that dyslexia is a lifelong condition, and observes that there are many resources available to help individuals who suffer from dyslexia. (Pl. Mem. Opp. Summ. J. 16-17.) These statements provide no insight into how Teachout's dyslexia affects *him* individually. Looking beyond Teachout's briefing, and to the record as a whole, Teachout's claim of disability based on his dyslexia finds no support. The Court can only assume that the

ability to work is the major life activity Teachout claims is affected by his dyslexia. While Teachout nowhere explicitly states this, the only evidence he offers regarding the effects of his dyslexia is related to work. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." Sutton, 527 U.S. at 491. There is insufficient evidence in the record to support a conclusion that Teachout's dyslexia substantially limited his ability to work for DOE, much less that it limited his ability to perform a "broad class" of jobs.

Teachout claims that his dyslexia causes him to need more time to prepare for class, results in an inability to "be spontaneous," makes it easier for him to get "stressed out," and causes spelling problems that necessitate double-checking when he writes on the board. (Teachout Aff. ¶ 9.) Teachout admits that "it takes [him] a little longer to do things, but that [he is] able of doing them." (Teachout Dep. 57-58.) Completing work at a slower pace due to dyslexia does not ordinarily qualify as a disability under the ADA.[6] See Frank v. Plaza Constr. Corp., 186 F. Supp. 2d 420 (S.D.N.Y. 2002). Teachout does not explain how his inability to be spontaneous or his increased susceptibility to stress affect his ability to work, and without such evidence there is no basis to conclude that the effect would be substantial or that it would apply to a broad class of jobs. Therefore, there is insufficient evidence to support Teachout's claim that his dyslexia is a disability under the ADA.

---

[6] Speed of performance is of course a question of degree, and a theoretical ability to perform work tasks if given some commercially impractical or totally unreasonable period in which to complete them would not defeat a finding of disability. Teachout makes no such claim, however. To the contrary, he appears to argue that he can perform all work functions, even the functions of a reading-intensive position, with only modest accommodations or adjustments in schedule. Such minor inhibitions on the speed with which tasks can be performed, while inconvenient, do not amount to a disability.

B.  Teachout's Diabetes Is Not a Disability

Teachout claims that his diabetes substantially limits two major life activities: eating and eliminating waste.

Eating is a major life activity.  See Forest City Daly Housing, Inc. v. Town of N. Hempstead, 175 F.3d 144, 151 (2d Cir. 1999) (stating that district court was correct to consider eating a major life activity).  However, Teachout has not produced sufficient evidence to create an issue of fact with respect to whether his diabetes substantially limits his ability to eat. Teachout asserts that his diabetes makes it important for him to eat regular meals.  (Teachout Aff. ¶ 28.)  He also tries to eat smaller meals.  (Teachout Dep. 42.)  These minor adjustments cannot be said to significantly restrict the manner in which Teachout eats.  29 C.F.R. § 1630.2(j)(1).  Teachout's dietary restrictions, unaccompanied by any "impairment to his ability to eat and digest food," simply do not rise to a substantial level.  See Shields v. Robinson-Van Vuren Assocs., Inc., No 98 Civ. 8785, 2000 WL 565191, at *5 (S.D.N.Y. May 8, 2000).

Teachout also claims that his diabetes substantially limits his ability to eliminate waste. (Pl. Mem. Opp. Summ. J. 15.)  Whether or not eliminating waste is a major life activity remains an open question in this Circuit, see Ryan, 135 F.3d at 871 ("[a]ssuming, without deciding, that the ability to control one's elimination of waste is a major life activity"),[7] but for the purposes of

_____

[7] It is unclear from DOE's papers whether it argues that eliminating waste is not a major life activity, or if it assumes that eliminating waste is a major life activity and argues that Teachout's diabetes does not substantially limit his ability.  While DOE never directly challenges Teachout's assertion that the ability to eliminate waste is a major life activity, the lack of clarity in DOE's briefing cannot be read as a stipulation or a concession that it is.

this motion, the Court will assume that it is.[8] In any event, Teachout has not produced sufficient

evidence to support his claim that his diabetes substantially limits his ability to eliminate waste.

Teachout claims that his diabetes causes incontinence.[9] (Pl. Mem. Opp. Summ. J. 14.) In

describing his incontinence, Teachout asserts that he suffers from only "slight" accidents,

sometimes none at all over the course of a week, and sometimes as many as three. (Teachout

Aff. ¶ 18.) He says that his incontinence is "occasional" and that it was "under control" during

the entire year of 2004. (Teachout Dep. 52.) Furthermore, Teachout states that the severity and

frequency of his incontinence depends on his maintenance of his blood sugar levels. (Id.) In

addition to describing the nature of his incontinence, Teachout presents evidence of ways in

which his incontinence affects his life, such as needing to be near a bathroom at work, using a

urinal in his car during drives, and sitting on the aisle at movies. (Id. 50; Teachout Aff. ¶ 6.)

That evidence, however, relates to limitations on activities *other* than the elimination of waste,

---

[8] Considering the structure of the ADA's definition of disability – requiring a physical impairment that substantially limits a major life activity – one could consider problems with elimination of waste as the *impairment*, and then examine what major life activities are affected. See, e.g., Johnson v. New York Medical College, No. 95 Civ. 8413, 1997 WL 580708 (S.D.N.Y. Sept. 18, 1997) (discussing the effect of colitis on the major life activities of work and sex). However, when compared to major life activities provided by agency regulations, such as seeing, breathing, and hearing, see 29 C.F.R. § 1630.2(i), quoted in Ryan, 135 F.3d at 870, a bodily function such as the elimination of waste appears analogous to several of the agency's examples. Indeed, the elimination of waste is "basic to any person's daily regimen, [and] is also a daily activity that the average persona can accomplish with little effort." Heiko v. Colombo Savings Bank, 434 F.3d 249, 255 (4th Cir. 2006). Viewed in this light, then, it is not surprising that "every circuit court to address the issue has concluded that waste elimination is a major life activity." Id.

[9] The causal link between Teachout's diabetes and his incontinence is not clear. He began suffering from incontinence before he became a diabetic, although he claims that since the onset of his diabetes his incontinence has become a more frequent problem. (Teachout Dep. 52.) In any event, regardless of what impairment is causing Teachout's incontinence, it is not substantially limiting his ability to eliminate waste.

such as the ability to work or the ability to travel.  Aside from the ability to eat, Teachout has not

asserted that his diabetes substantially limits anything other than his ability to eliminate waste,

and so evidence relating to other activities is irrelevant, except in so far as it sheds light on the

extent to which his ability to eliminate waste has been limited.[10]

Teachout has failed to raise a triable issue of fact as to whether his diabetes substantially

limits his ability to eliminate waste.  While the record supports a finding that Teachout's diabetes

has *affected* his ability to eliminate waste, the ADA makes a distinction between impairments

that affect a major life activity and those that substantially limit such activity.  Here, Teachout's

affidavit and deposition are replete with language that explicitly limits the severity of his

incontinence.  He states that he only suffers from it "occasionally" (Teachout Dep. 52; Teachout

Aff. ¶ 6), and that he doesn't "have it all the time" (Teachout Dep. 52).  After minimizing the

effects of his incontinence, Teachout admits that his symptoms are further mitigated by

monitoring his blood sugar and eating meals at regular times.  (Id. 52; Teachout Aff. ¶ 6.)  It is

Teachout's burden to show that the limitation on his ability to eliminate waste is substantial;

given the limited extent of his symptoms and his conceded ability to mitigate them, he has not

met that burden.  He provides no evidence, other than his own statements describing occasional

and intermittent instances of incontinence, from which a trier of fact could conclude that his

ability to eliminate waste has been substantially limited.  Compare Mazza v. Bratton, 108 F.

_____

[10] Teachout could have chosen to label his incontinence as his "impairment," and then argued that his incontinence substantially limits certain other major life activities.  He has not so argued, however, and the relevance of various pieces of evidence in the record is affected accordingly.  Because Teachout's characterization of his claim has affected the way both parties have developed and presented the record, the Court is in no position to recast the claim and assess the evidence as it might be applied to a claim the plaintiff (who has been represented by counsel throughout) has not made.

Supp. 2d 167, 174 (E.D.N.Y. 2000) (finding triable issue of fact where plaintiff produced hospital records and medical evidence showing severity of his condition).

C. Teachout's HIV Infection Is a Disability

Teachout claims that his HIV-positive status is a disability because it substantially limits the major life activity of reproduction. HIV infection is a physical impairment during all stages of the infection, Bragdon v. Abbott, 524 U.S. 624, 637 (1998), and the ability it reproduce is a major life activity, id. at 639. Additionally, the Supreme Court has acknowledged the abundance of medical evidence showing that the HIV infection substantially limits the ability to reproduce as a general matter, and Teachout is not required to reinvent that wheel in response to DOE's motion for summary judgment. Id. at 639-42. However, HIV infection has not been held to be a disability *per se*, id. at 642, so this Court must still undertake the ADA's case-by-case inquiry as to whether a plaintiff's HIV infection substantially affects *plaintiff's* ability to reproduce. See Colwell, 158 F.3d at 643.

DOE argues that in this case, Teachout has failed to produce evidence that his HIV infection substantially affects his ability to reproduce. DOE notes that at his deposition, Teachout listed only "tiredness" as an effect of his HIV infection, and when asked if there were specific activities he could not perform because of his HIV infection, he replied, "I am not sure. I don't believe so." (Teachout Dep. 33-34.) These responses, however, are of little relevance to the question at hand. During this portion of the deposition, DOE asked Teachout about activities in his "day-to-day" life. (Id. 33.) Given that narrow focus, it is not surprising that Teachout would not mention the ability to reproduce as a day-to-day activity limited by his HIV-positive status. Furthermore, it is unclear what inference DOE seeks to draw from Teachout's failure to

14

mention reproduction during his deposition. Certainly, Teachout's failure to mention reproduction at his deposition is not evidence that he carries some previously unknown strain of the disease, one that does not affect the ability to reproduce. A reasonable fact finder could conclude that Teachout did not mention reproduction during his deposition because he was focused on more mundane common activities.

DOE's argument, however, does raise the following question: If HIV infection is an impairment, and HIV infection substantially affects the ability to reproduce, and the ability to reproduce is a major life activity, then what place is there for an individualized case-by-case inquiry to determine if HIV infection is a disability for a particular plaintiff? To avoid the creation of a *per se* rule, the Supreme Court in Bragdon noted that the plaintiff had testified that her HIV infection affected her "decision" not to have a child. 524 U.S. at 641-42. Bragdon does not, however, hold that such a statement is required in every case to avoid summary judgment; just three sentences earlier the Court stated that "the disability definition does not turn on personal choice." Id. It is not necessary for a plaintiff to want to have children, or for a plaintiff to plan to have children, to show that his *ability* to have children has been substantially limited by infection with HIV.[11] If, however, a plaintiff were to claim that his HIV infection

_____

[11] A definition of disability that turns on personal choice, and not personal ability, could lead to questionable results. For example, in Blanks v. Sw. Bell Commc'ns, Inc., the Fifth Circuit held that the record before it could not support a finding that the HIV-positive plaintiff was disabled. 310 F.3d 398, 401 (5th Cir. 2002). This conclusion was based on the fact that plaintiff and his wife had decided not to have children, and that plaintiff's wife had undergone a procedure that prevented her from becoming pregnant. Id. However, there was no evidence that plaintiff himself was otherwise physically *unable* to reproduce as a general matter due to some condition other than his HIV status. Therefore, under the reasoning of the Fifth Circuit, it would appear the plaintiff could suddenly "become" disabled if he decided he wanted to have a child with another woman, or if his wife's procedure were somehow reversed. A definition of disability that depends on the inner desires of a plaintiff's spouse would be quite puzzling indeed. A blind man is no less blind when he decides to shut his eyes, and the fact that a deaf

substantially limited his ability to reproduce, but the evidence in the record showed that he was physically incapable of reproduction for reasons unrelated to his HIV-positive status, such as a voluntary irreversible sterilization, then in that case, the plaintiff would not have a disability under the ADA.[12]

On the record here, a reasonable trier of fact could conclude that Teachout's ability to reproduce was substantially limited by his HIV-positive status. First, the record contains no evidence that plaintiff, a 47 year old male, has any condition other than his HIV infection that would affect his ability to reproduce. Furthermore, the record contains an affidavit from Teachout's partner, which states that within the past seven years they "began to talk about having a child." (Rosenberg Aff. ¶ 3.)[13] This statement, combined with the lack of evidence pointing to any alternative inability to reproduce, is sufficient to create an issue of fact regarding the affect of plaintiff's HIV infection on the major life activity of reproduction.

D. Teachout Was Not "Regarded as" Disabled

Teachout argues that while DOE is *now* claiming that Teachout is not disabled, DOE's own documents show that DOE regarded him as disabled during his employment. (Pl. Mem.

---

person may not desire the ability to hear, see Felicity Barringer, Pride in a Soundless World: Deaf Oppose a Hearing Aid, N.Y. Times, May 16, 1993, does not render her not "disabled" under the ADA, or legalize discrimination against her on the basis of her deafness.

[12] Of course, in such a circumstance the plaintiff could claim that some other major life activity was substantially limited by his HIV infection. The case-by-case inquiry depends not just on the circumstances of the plaintiff, but also on the particular argument he is advancing with respect to a specific life activity.

[13] The affidavit states that Teachout and his partner discussed having a child in the past, but that since Teachout's termination that desire has been put on hold. However, while Teachout's desire may be currently on hold, it still serves as evidence that Teachout is otherwise capable of having children, and at a minimum that he is not irrevocably committed not to reproduce.

Opp. Summ. J. 10.)  In support of this argument, Teachout points to a letter he received from a DOE administrator stating that "pursuant to the Americans with Disabilities Act (ADA) and our review of the medical documentation submitted, it is the determination of the Medical Director that you be provided with [an accommodation]."  (Repetto-Cruz Aff. Ex. A.)

Teachout is correct that the "ADA covers those who have a disability and those who are perceived to have a disability."  (Pl. Mem. Opp. Summ. J. 10.)  The ADA defines as a disability "being regarded as having such an impairment," 42 U.S.C. § 12102(2)(C), that is, being regarded as having an impairment "that substantially limits one or more of the major life activities," id. § 12102(2)(A).  It is not enough under this definition for a defendant to simply regard a plaintiff as disabled, the defendant must regard him as disabled "*within the meaning of the ADA*."  Giordano v. City of New York, 274 F.3d 740, 748 (2d Cir. 2001).

There are two ways a plaintiff can be "regarded as" disabled within the meaning of the ADA; either (1) the defendant "mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities," or (2) the defendant "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Id. In either case it is necessary that the defendant "entertain misperceptions about the individual," Sutton, 527 U.S. at 489, not about the law.  In other words, if an employer fires an employee because he mistakenly believes the employee is blind, blindness being an impairment that substantially limits the activity of seeing, that employee is regarded as disabled under the first category, even though he is not blind.  If, on the other hand, an employer fires an employee because the employee has a hangnail, and the employee *does* have a hangnail, but the employer mistakenly believes that hangnails substantially limit the ability to work, that employee is

regarded as disabled under the second category. However, if an employer fires an employee because the employee has a hangnail, and the employer accurately understands all the ways the hangnail affects the employee's life, but mistakenly believes those effects qualify as a substantial limitation of a major life activity under the ADA case law, those circumstances fit under neither the first nor second category of "regarded as" disabled, and the employee is not disabled under the ADA.

The letter provided by Teachout, viewed in the light most favorable to him, supports a finding similar to the third example discussed above, but not a finding that DOE regarded Teachout as disabled under the ADA. The letter is a response to one of Teachout's accommodation requests, and the response grants that request while arguably indicating that DOE believed the accommodation was required by the ADA.[14] A rational trier of fact could conclude, based on the evidence presented by Teachout, that DOE regarded Teachout's need to be near a bathroom, or his diabetes generally, as a condition that placed him within the protection of the ADA. That belief, however, in and of itself, does not mean that DOE "regarded" him as disabled under the ADA. The letter provides no evidence that DOE was mistaken with respect to the impairment Teachout had, so Teachout does not fit within the first category of "regarded as" disabled, nor does the letter support a finding that DOE overestimated the extent to which Teachout's impairment would limit him, so neither does he fit within the second category of "regarded as" disabled. To the contrary, even in the light most favorable to Teachout, the letter shows at most that DOE knew what his impairment was, knew how it

--------

[14] The letter could also be read as acknowledging that Teachout's *request* was pursuant to the ADA, not that DOE was granting his request because it believed the ADA required it. While that may be the more sensible reading of the letter, on this motion for summary judgment all inferences must be made in Teachout's favor.

affected his life, and mistakenly thought that the combination of the impairment and the effect was covered by the ADA. Therefore, Teachout was not "regarded as" disabled by DOE under the ADA.[15]

## II. Adverse Employment Action Because of His Disability

Because a reasonable jury could conclude that Teachout's HIV infection is a disability under the ADA, he has satisfied the first and second elements of a prima facie showing of disability discrimination. To survive summary judgment, however, Teachout must also show that he was qualified to perform his job and that he suffered an adverse employment action because of his disability. See Cameron, 335 F.3d at 63.

Teachout has failed to make the necessary showing. It is unclear from the muddled nature of Teachout's complaint and briefing if he *ever* intended to claim that he suffered an adverse employment action because of a claimed disability, or, if he did so claim, what that adverse employment action was. In his complaint, Teachout alleges that DOE "discriminated against plaintiff because of his disability, in violation of the ADA." (Compl. ¶ 27.) However, while the ADA prohibits discrimination in the discharge and treatment of employees, it also

---

[15] A contrary reading of the law would have unfortunate policy consequences. Whether or not required by the ADA, it is both humane and good business practice for employers to make reasonable accommodations for otherwise capable employees with physical impairments that do not rise to the level of ADA-defined disabilities. Assigning Teachout to a classroom near a bathroom is the decent thing to do, regardless of whether it is required by law. If doing so, or doing so while making any reference to the ADA or to the concept of "disability," were to have the effect of encompassing the accommodated person within a protected class, employers would be discouraged from making such voluntary accommodations, and indeed would have an incentive to dispute the claims even of persons who might eventually be found to be disabled within the meaning of the ADA. The statute's legitimate concern to prevent discrimination against those who are "regarded as" disabled as that term is properly understood should not, by *mis*construction of the term, be transformed into a legal concept with counterproductive results for the disabled, the non-disabled, and employers alike.

defines "discriminate" to include "not making reasonable accommodations." 42 U.S.C. § 12112(a) & (b)(5)(A). It would be a perfectly sensible reading of the complaint to conclude that this allegation concerned only Teachout's claims of denied accommodation requests, and nothing more.

Teachout's complaint lists the following disability-related allegations: DOE denied his request for a bathroom accommodation related to his diabetes (Compl. ¶ 19), DOE took away his sick pay (id. ¶ 21), Frey laughed at him, Frey subjected him to evaluations, Frey gave him negative evaluations, Cali called him stupid, Cali gave him negative evaluations, Cali joked with other teachers about his spelling errors (id. ¶ 23), and Frey denied his request for a lunch accommodation related to his diabetes (id. ¶ 24). The final factual allegation of Teachout's complaint reads: "Plaintiff complained repeatedly about the unlawful treatment to which he was subjected, but nothing was done to ameliorate or remedy the situation. In fact, after plaintiff complained, he continued to be harassed, abused, singled out for scrutiny, insulted, written up and ultimately terminated." (Id. ¶ 25.) From that paragraph, it is unclear whether plaintiff alleges he was terminated because of retaliation or because of his disability, but a fair reading of the complaint could include both allegations.

Ambiguity during the initiation of an action is understandable. When he filed his complaint, Teachout was not required to specifically allege his theories and explanations for DOE's conduct toward him. See Fed. R. Civ. P. 8(a). However, more specificity is required at this later stage in the litigation. In response to DOE's motion for summary judgment, Teachout simply does not argue that he was terminated, or that any other adverse employment action was taken against him, because of his HIV-positive status.

Teachout's memorandum in opposition to summary judgment contains a section entitled: "H.  Plaintiff Suffered Adverse Employment Actions Because of His Disabilities and In Retaliation for Complaining About Discrimination."[16]  (Pl. Mem. Opp. Summ. J. 19.)  It contains two subsections.  The first subsection is entitled:  "1. Adverse Employment Actions Giving Rise to an Inference of Discrimination."  (Id.)  That subsection contains no text; it is completely empty.  Immediately under the heading for the first subsection comes the heading for the second subsection, entitled "2. Defendants' Failure to Adequately Assist Plaintiff to Improve Work Performance."  (Id.)  That section is less than half a page long, not including the heading, and makes only the following observations: (1) "If plaintiff's work performance was so poor, then why didn't defendants assist him *before* he received *several* observation reports?" (2) Defendants "fail to elaborate" that Teachout had a personal mentor for only one month, and (3) Cali scheduled times for Teachout to observe other teachers, but Teachout was out sick on many of those days.  (Id. 19-20.)   Teachout then spends over four pages supporting his claim of retaliation.  (Id. 20-24.)

It is doubtful that supplying a mentor for only one month or waiting until after several poor evaluations to provide assistance would qualify as adverse employment actions, see Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (defining "adverse employment action" as a "material adverse change in the terms and conditions of employment"), and it is unclear how the fact that Teachout was sick on days he had an opportunity to observe other teachers is an action of any sort by DOE.  In any event, Teachout provides no evidence

---

[16] Additional confusion results from the fact that this heading includes the words "and In Retaliation for Complaining," while the next heading, for a separate section, is entitled "I. Plaintiff Can Establish a *Prima Facie* Case of Retaliation."  (Pl. Mem. Opp. Summ. J. 19-20.)

linking these actions, or possible actions, to discrimination based on his HIV-positive status, and by not even attempting to provide this link, Teachout cannot make out the fourth requirement of a prima facie case of discrimination on these claims. To the extent that Teachout ever intended to assert broader claims relating to other adverse employment actions taken against him because of his HIV-positive status, he has abandoned those claims by focusing his opposition papers exclusively on his accommodation claims and his retaliation claim.[17] Cobian v. City of New York, No. 04 Civ. 1941, 2006 WL 212292, at *3 (S.D.N.Y. Jan. 24, 2006).

This is not a case where plaintiff simply briefed some of his claims more heavily than others. Rather, the structure and substance of Teachout's briefing leads to the conclusion that Teachout is advancing a single coherent theory: that while working at Forest Hills he requested accommodations for his disabilities, that those requests were denied, that he complained about his mistreatment, and that he was given unsatisfactory evaluations and eventually terminated in retaliation for those complaints. This theory is evidenced by the introductory section of Teachout's response memorandum, in which he claims "[t]he negative observation reports and the annual performance rating sheet evidence the retaliatory treatment that followed [his OEO complaints], which ended in plaintiff's termination." (Pl. Mem. Opp. Summ. J. 4.) In the section of his memorandum supporting his retaliation claims, Teachout makes numerous attempts to link his termination to his protected activities. He argues that DOE "took an adverse employment action against plaintiff subsequent to his complaints when they . . . terminated him

---

[17] Because of this Court's conclusion that Teachout is not disabled with respect to his diabetes or dyslexia, Teachout's HIV infection is the only remaining basis on which he can claim discriminatory adverse employment actions. Evidence in the record that would tend to show Teachout suffered adverse employment actions because of his diabetes or dyslexia is therefore irrelevant to the question of whether he was discriminated against in a manner actionable under the ADA.

from his employment." (Id. 20.) He notes how his OEO complaint and DHR complaint were followed closely by his unsatisfactory 2002-2003 rating, the denial of his probationary status, and his eventual termination. (Id.) He raises Frey's offer to withdraw Teachout's unsatisfactory rating in exchange for Teachout's withdrawal of his DHR complaint. (Id. 23.) In contrast, Teachout does not attempt to connect his termination with any discrimination against him *based on his HIV-positive status*.

In any event, even if Teachout were to attempt to make such a connection, the evidence in the record would not support it. Indeed, the lack of evidence linking Teachout's HIV-positive status to any adverse employment action by DOE is a rational reason *not* to advance such a claim to begin with. There is virtually no evidence in the record concerning when, or even if, Frey, Cali, or any administrator at Forest Hills knew of Teachout's HIV infection, and no evidence linking that knowledge to adverse employment actions. The only pieces of evidence relating to Teachout's HIV infection are his accommodation request form, his allegation to OEO that Forest Hills supervisors knew of his HIV infection, his OEO complaint that was forwarded to Frey, and the DHR's determination regarding Teachout's complaint.

Teachout's accommodation request form indicates "HIV" as a disability. (Ayazi Decl. Ex. L.) Any administrator who saw this form, therefore, would be aware of Teachout's HIV-positive status. However, the form is dated November 7, 2001, a year before Teachout began working at Forest Hills. Below the date on the form is the notation "Not sent to MB" and the date "3/26/02." Neither party explains what these notations mean, if this form was ever sent to Forest Hills, when it would have been sent to Forest Hills, or if it was ever seen by Cali or Frey.

In Teachout's email to OEO on March 4, 2003, he claims that his file, with the aforementioned accommodation request, had been sent to Forest Hills, and that since viewing the file Cali had become very critical of him. (Id. Ex. II.) The email makes no claim regarding when the file was sent. In response to Teachout's email, OEO asked how Teachout knew that Cali had seen his file and the accommodation request. (Id.) Teachout did not respond to OEO's request for more information, and his allegation regarding Cali's viewing of his file is not renewed in his response to DOE's motion, either in briefing or in any sworn testimony. Therefore, Teachout's allegation in his March 4, 2003, email remains just that, an inadmissible unsworn allegation in an email written ten months prior to the commencement of this litigation.[18]

Lastly, the DHR's determination, which dismissed Teachout's complaint, states that there was no evidence in connection with the claim "that Mr. Frey or Barbara Cali . . . learned of his HIV status and verbally abused and harassed him. The record indicates that prior to learning of his HIV status, [Teachout's] supervisors observed that [Teachout's] work performance needed improvement . . . ." (Id. Ex. ZZ.) While this statement is somewhat ambiguous, the words "prior to learning of his HIV status" seem to indicate that there was some evidence in the record before the DHR that at some time Cali and Frey learned of Teachout's HIV infection. The record before this Court, however, contains no evidence regarding what that evidence might have been.

In sum, on this motion for summary judgment, the only evidence that Teachout's supervisors at Forest Hills knew of his HIV-positive status is a document that may not have been

---

[18] On April 9, 2003, OEO forwarded an email it had received from Teachout to Frey as part of OEO's investigation into Teachout's complaints. (Id. Ex. QQ.) In that thirteen-line email Teachout states, "my t-cells are down." (Id.) That is the only reference to his HIV infection anywhere in the record that appears to have reached Forest Hills personnel. Teachout does not refer to it or attach any significance to it.

seen by anyone at Forest Hills, a prior unsupported email allegation, and four words in an email

Frey received in April 2003. There is nothing in the record connecting any of this evidence to

any adverse employment action. Therefore, even if Teachout did choose to advance a claim he

suffered an adverse employment action because of his HIV infection, the evidence in the record

would be insufficient to support such a claim.

III. Teachout's Accommodation Claims

To make a prima facie showing for a claim that a defendant failed to provide reasonable

accommodations, the plaintiff must show that: "(1) [he] is a person with a disability under the

meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with

reasonable accommodation, [he] could perform the essential functions of the job at issue; and (4)

the employer has refused to make such accommodations." Rodal v. Anesthesia Group of

Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004). Here, Teachout claims that DOE denied four

requests for reasonable accommodations necessitated by his disabilities: a classroom close to a

restroom because of his diabetes, a fixed lunch time each day because of his diabetes, time off

for doctor visits because of his HIV-positive status, and an overhead projector for class

preparation because of his dyslexia. (Pl. Mem. Opp. Summ. J. 16, 24-26.) Three of these claims

– proximity to a restroom, fixed lunch time, and overhead projector – are now moot because, as

explained above, Teachout has not raised an issue of fact as to whether he is disabled in

connection with the underlying impairments for which these accommodations were sought. See

Felix v. New York City Transit Auth., 324 F.3d 102, 105 (2003) (holding that impairments that

do not qualify as disabilities under the ADA do not require accommodations under the ADA).

Thus, Teachout's only surviving accommodation claim is that DOE denied him time off for clinic visits in connection with treatment for his HIV infection. Teachout's request of DOE was clear; his accommodation form states: "approximately 1x month need to leave early (maximum ½ day)." (Ayazi Decl. Ex. L.)

Teachout has produced no evidence that this request was ever denied, and therefore he has failed to raise a triable issue of fact.[19] To support his claim, Teachout states that "Cali admits frequently reprimanding plaintiff for being late to school." (Pl. Mem. Opp. Summ. J. 24.) Even if this were the case, Teachout's frequent tardiness and Cali's responses thereto have nothing to do with the specific accommodation Teachout requested, which was to leave early once a month for scheduled clinic visits. With respect to his once a month, half-day visits, Teachout provides no evidence that he was ever denied the requested accommodation, and therefore DOE is entitled to summary judgment on this claim.

## IV. Teachout's Retaliation Claims

A prima facie case of unlawful retaliation requires a plaintiff to show that: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

Teachout engaged in several protected activities. First, when he arrived at Forest Hills on October 28, 2002, Teachout showed Frey his accommodation letter regarding his need to be

---

[19] As discussed above, the record contains no evidence concerning when or if Teachout's supervisors at Forest Hills ever received this form. In any event, even assuming they received it at some point, there is no evidence the request was denied.

near a bathroom.  (Teachout Aff. ¶¶ 14, 15.)  Good faith requests for accommodations are

protected activities.  <u>Weixel v. Bd. of Educ.</u>, 287 F.3d 138, 149 (2d Cir. 2002).[20]  Then, on

March 4, 2003, Teachout sent an email to OEO alleging that he was being discriminated against

at Forest Hills.  Finally, on May 1, 2003, Teachout filed a complaint against DOE with the DHR.

       The record contains sufficient evidence for a trier of fact to conclude that DOE knew

about these protected activities.  When Teachout showed Frey his accommodation letter on the

first day he arrived at Forest Hills, Frey certainly became aware of Teachout's request for

accommodations.  After Teachout made his email complaint to OEO, OEO emailed Frey and

Cali on April 10 and April 9, respectively, to inform them of Teachout's complaint.  (Def. Rule

56.1 Stmt. ¶¶ 54, 56; Ayazi Decl. Ex. DD & Ex. QQ.)  Finally, DOE admits knowledge of

Teachout's DHR complaint, because it claims Teachout was given an opportunity to continue

working for DOE if he withdrew the complaint.  (<u>See</u> Ayazi Decl. Ex. YY.)

       As a result of engaging in this protected activity, Teachout alleges that his supervisors at

DOE subjected him to the following adverse employment actions: unsatisfactory evaluations,

comments about his disabilities, and termination of his employment.  (Pl. Mem. Opp. Summ. J.

20.)  As an initial matter, two of the alleged retaliatory actions do not qualify as adverse

employment actions.  An adverse employment action is an action that causes a "material adverse

change in the terms and conditions of employment."  <u>Galabya</u>, 202 F.3d at 640.  Negative

comments, even comments relating to an individual's claimed disabilities, are not, standing

---

[20] The fact that Teachout's accommodation request was related to an impairment – his
diabetes – that is not a disability as defined by the ADA does not render that request unprotected.
It is enough that Teachout had a good faith belief that his request and the underlying impairment
were covered by the ADA.  <u>See</u> <u>Reyes v. New York State Office of Children & Family Servs.</u>,
No. 00 Civ. 7693, 2003 WL 21709407, at *8 (S.D.N.Y. July 22, 2003).  There is no evidence
that Teachout's request lacked good faith, and so his request was protected activity.

alone, adverse employment actions, because mere comments do not materially affect

employment.  Brennan v. City of White Plains, 67 F. Supp. 2d 362, 374 (S.D.N.Y. 1999).

Similarly, negative employment evaluations do not in and of themselves affect the terms and

conditions of employment, and they are not adverse employment actions either.  See Weisman v.

New York City Dep't of Educ., No. 03 Civ. 9299, 2005 WL 1813030, at *6 (S.D.N.Y. Aug. 1,

2005).  However, DOE does not contest, nor could it contest, that Teachout's eventual removal

from Forest Hills and termination from DOE were adverse employment actions.[21]

Having produced sufficient evidence to satisfy the first three elements of a prima facie

claim of retaliation, Teachout must now show that a causal connection exists between his

termination and his protected activity.  The necessary causal connection can be shown in either

of two ways: directly through evidence of retaliatory animus, or indirectly through evidence that

the protected activity was followed closely in time by the adverse action.  See Lovejoy-Wilson v.

NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001).  Here, Teachout has provided

evidence in both forms.  With respect to evidence of animus, Teachout offers two statements

allegedly made by Cali, his assistant principal who was responsible for many of Teachout's

evaluations.  Teachout alleges that Cali said to him "Don't think you are going to get away with

what you got away with before," and made a statement along the lines of "only children are

allowed to have disabilities, not teachers."  (Teachout Aff. ¶ 19.)  A reasonable trier of fact could

_____

[21] DOE claims that this Court lacks subject matter jurisdiction to hear any claims of
retaliation predating May 1, 2003, the date of Teachout's DHR complaint, because Teachout did
not raise any retaliation claims in that complaint, and this Court's subject matter jurisdiction is
predicated on an antecedent administrative charge.  See Hamilton v. Wilson, No. 03 Civ. 5685,
2004 WL 169789, at *2 (S.D.N.Y. Jan. 28, 2004).  Whatever the merits of this argument, it is
now moot, because the only true adverse employment action raised by Teachout is the loss of his
position at Forest Hills and employment with the DOE, which occurred after May 1, 2003.

conclude, based on this evidence, that Cali harbored retaliatory animus against Teachout because of his accommodation requests and complaints about mistreatment, that this animus influenced her treatment and evaluations of him, and that those poor evaluations and Cali's influence as assistant principal were factors in his eventual termination. See Phillips v. Chertoff, No. 03 Civ. 4266, 2005 WL 3466033, at *13 (S.D.N.Y. Dec. 16, 2005) (stating that while evaluations themselves are not adverse employment actions, negative evaluations based on retaliatory animus taint future actions taken on the basis of those evaluations). The record also contains evidence, in the form of a proposed agreement signed by Frey, that in July 2003 Frey offered to withdraw Teachout's unsatisfactory rating for the 2002-2003 school year, a rating which automatically triggered the revocation of his probationary employment at Forest Hills (Def. Reply Mem. Supp. Summ. J. 20 & n.7), in exchange for Teachout's agreement to withdraw his DHR complaint. This explicit link between Teachout's DHR complaint and his unsatisfactory rating could support a finding of retaliation.[22]

Teachout has also offered evidence that his dismissal followed closely in time after his protected activity. Teachout filed his DHR complaint on May 1, 2003. Two months later, on June 26, 2003, Teachout's probationary position at Forest Hills was revoked.[23] DOE terminated Teachout on October 10, 2003. While there is no bright-line rule for how much time must pass

---

[22] Curiously, it is DOE and not Teachout that produces the evidence of Frey's offer. However, despite producing the proposed agreement, DOE states that there is no "evidence establishing causation, except that the actions occurred after [Teachout] filed complaints." (Def. Mem. Supp. Summ. J. 26.)

[23] The record shows that on June 26, 2003, Teachout received an unsatisfactory evaluation for the 2002-2003 school year as a whole. (Ayazi Decl. Ex. XX.) DOE represents that this unsatisfactory evaluation automatically precluded Teachout's continued probationary employment at Forest Hills. (Def. Reply Mem. Supp. Summ. J. 20 & n.7.)

before the thread of inference is broken, the circumstances of this case would allow a reasonable fact finder to infer a retaliatory connection based on the less than two months between Teachout's DHR complaint and the loss of his probationary position, which was then followed three months later by his termination.  See Demoret v. Zegarelli, 361 F. Supp. 2d 193, 204-05 (S.D.N.Y. 2005) (stating that circumstances allowed retaliatory inference despite six month gap between protected activity and adverse action).

DOE argues that Teachout has not made a showing of causal connection, despite the fact that the loss of his position followed shortly after his May 1, 2003, complaint, because Frey had begun to lay the groundwork for Teachout's eventual dismissal with a letter to the superintendent on April 7, 2003 (Ayazi Decl. Ex. OO), and Cali was already dissatisfied with Teachout's performance in January, 2003 (id. Ex. BB).  DOE is correct that Teachout's complaint in May could not have been the basis of actions taken by DOE in January and April.  However, Teachout's May DHR complaint was not the only protected activity he undertook.  Teachout's requests for accommodations began as soon as he arrived at Forest Hills, and a reasonable fact finder could conclude, based on timing, on Cali's alleged hostile comments, and on Frey's proposed agreement, that Teachout's accommodation requests affected his evaluations, including his January 2003 evaluation.  Furthermore, to the extent that Frey's April 7 letter was based on those evaluations, that does not defeat Teachout's showing of causation, because it too carries the taint of retaliatory animus.  See Phillips, 2005 WL 3466033, at *13.

Having made a prima facie showing of retaliation, the burden of production now shifts to the defendant, who must offer evidence that it had a legitimate reason for its actions not motivated by retaliation.  See Heyman v. Queens Village Comm. for Mental Health, 198 F.3d

68, 72 (2d Cir. 1999) (explaining burden shifting for ADA claims and noting it is the same as that for Title VII claims); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The determination whether or not the defendant has met this burden "can involve no credibility assessment." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant produces evidence of a non-retaliatory reason for its actions, then its burden is satisfied, and all that remains is the ultimate burden of persuasion which must at all times be born by the plaintiff. Id. at 510-11. To avoid summary judgment the plaintiff must then present sufficient evidence for a reasonable fact finder to conclude that the defendant's purported explanation is merely a pretext, and that retaliation actually motivated defendant's actions. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

Here, DOE asserts that Teachout's poor work performance, and not retaliation, was the reason for his termination, and produces numerous evaluations in support of this assertion. Of course, DOE claims that these evaluations are not tainted by retaliatory animus, and at this stage of the burden shifting this Court can not weigh the credibility of that claim. Therefore, DOE has met its burden of production.

The only remaining question is whether Teachout has produced sufficient evidence to create an issue of fact as to whether DOE's justification is pretextual and retaliation motivated his termination. He has done so. A reasonable finder of fact could conclude that upon his arrival at Forest Hills, Teachout was immediately considered a "problem" due to his requests for accommodations, and continued to be viewed that way as he complained about his ongoing treatment at the school. There is an abundance of evidence that animosity existed between Cali and Teachout throughout his employment at Forest Hills, and the basis for that animosity is a

question of fact.  A trier of fact could conclude that Cali's evaluations were motivated by retaliatory animus, and that future decisions based on those evaluations, such as Teachout's denial of probation and termination, were tainted by that animus.  DOE claims, with the support of numerous evaluations, that Teachout was an unsatisfactory teacher.  Teachout contends that those evaluations were unfairly influenced by retaliation, and that he was a satisfactory teacher, as evidenced by the fact that he was well liked by his students and that he never received any complaints from students or parents.  (Teachout Aff. ¶ 33.)  A reasonable finder of fact could certainly accept DOE's justification, but as a matter of law it would not be required to.

V.  Teachout's Requests for Front Pay, Back Pay, and Reinstatement

DOE argues that regardless of whatever claims survive summary judgment, Teachout cannot obtain front pay or reinstatement because false statements made on Teachout's employment application would have independently lead to his termination, and Teachout cannot obtain back pay after the date DOE discovered his misconduct.  (Def. Mem. Supp. Summ. J. 5.)  DOE has provided what it claims to be Teachout's license application from 1995, in which he apparently asserts that he had never received an unsatisfactory rating, that charges had never been brought against him by an employer, and that no such charges had ever been sustained.  (Ayazi Decl. Ex. D, at 4.)  DOE then provides documentation that shows these statements on Teachout's 1995 application were false.  (See id. Exs. B & C.)

In response to this allegation, Teachout denies that the license application provided by DOE is in fact *his* application.  (Pl. Mem. Opp. Summ. J. 8.)  Teachout claims that while some of the writing on the first page of the application is his, the signature is not his, and there is handwriting on the document he does not recognize.  (Teachout Supplemental Aff. ¶¶ 3, 4.)

Teachout also provides examples of his handwriting for comparative purposes.  (Id. Ex.)

It is not this Court's role, nor is this Court equipped, to engage in a handwriting analysis to determine whether the signature on DOE's Exhibit D is in fact Teachout's signature.  This dispute presents a question of fact, and Teachout's claims for front pay, back pay, and reinstatement will survive summary judgment.

VI.  Teachout's State Law Claims

DOE argues that because Teachout brought allegations of discrimination before the DHR, and the DHR denied Teachout's allegations, Teachout is now collaterally estopped from making those same allegations here.  (Def. Mem. Supp. Summ. J. 32-34.)

Four requirements must be satisfied for collateral estoppel to apply: "(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits."  Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986).  DHR determinations are given preclusive effect in federal courts if the requirements of collateral estoppel are otherwise met.  See, e.g., James v. City of New York, No. 01 Civ. 30, 2003 WL 21991591 (S.D.N.Y. Aug. 20, 2003).  The proponent of the estoppel has the burden to show that the issues are identical, but it is the opponent's burden to show the lack of a full and fair opportunity to litigate a particular issue.  Id. at *4.

Here, Teachout does not argue that he was not offered a full and fair opportunity to litigate his claims with the DHR.  Rather, he simply asserts that the issues are not identical because the instant complaint concerns events leading up to his termination in October 2003, and

his DHR complaint concerned events that occurred prior to May 1, 2003.

Teachout is correct that the different complaints address different time periods, and so there are certain issues that are not identical and therefore not subject to estoppel. For instance, Teachout's claim of retaliation is not estopped by the DHR findings, because that allegation is predicated in part on the filing of the DHR complaint itself, and is not addressed by DHR in its decision. Indeed, DOE does not argue that Teachout's retaliation claim is estopped; it only advances its estoppel argument against his discrimination claims.

 With respect to those discrimination claims, however, the adverse DHR finding precludes all issues relevant to Teachout's state law discrimination claims. First, as discussed above, Teachout is not advancing the claim that he was terminated because of discrimination based on his disabilities. The only non-frivolous disability discrimination claims advanced by Teachout relate to the alleged denial of his accommodation requests. Each of these alleged requests occurred before May 1, 2003, when he filed his DHR complaint, and the DHR determination is clear on the issue of Teachout's accommodation requests: "It is undisputed that after Complainant informed Mr. Frey that he was diabetic, and requested to be assigned a classroom close to a bathroom, Mr. Frey accommodated Complainant's request. It is also undisputed that no other accommodation was requested by the Complainant."[24] (Ayazi Decl. Ex. ZZ.) The DHR proceeding decided the issue of whether DOE denied Teachout's requests for accommodations. Therefore, Teachout is collaterally estopped from raising that issue again under the guise of a state law discrimination claim. However, since failure to accommodate is

_____

[24] Teachout does not argue that the lack of dispute on this issue was due to the lack of a full opportunity to litigate his accommodation claims. If this were the case, it was his burden to raise the argument.

the only disability discrimination claim Teachout advances, then his state law disability discrimination claim must fail as a whole.

## CONCLUSION

DOE's motion for summary judgment is granted with respect to all state and federal claims of discrimination based on Teachout's claimed disabilities (First and Second Claims for Relief). DOE's motion is denied with respect to Teachout's claims of retaliation (Third and Fourth Claims for Relief). DOE's motion is also denied with respect to Teachout's requests for front pay, back pay, and reinstatement.

SO ORDERED.

Dated: New York, New York
      February 22, 2006

GERARD E. LYNCH
United States District Judge